# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEAN-CLAUDE MOUSTACAKIS and IZABELA OLENDSKA-MOUSTACAKIS, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiffs,<br><br>     v.<br><br>iTONIC HOLDINGS LTD (f/k/a PHETON HOLDINGS LTD); JIANFEI ZHANG; ZHIXIN LI; PENGFEI ZHANG; CATHAY SECURITIES, INC.; DOMINARI SECURITIES LLC; and MARCUM ASIA CPAS LLP,<br><br>        Defendants. | Case No. 26-cv-6484<br><br>Jury Trial Demanded |

## CLASS ACTION COMPLAINT FOR
## <u>VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>

**MORRIS KANDINOV LLP**
Aaron T. Morris
Andrew W. Robertson
305 Broadway, 7th Floor
New York, NY 10007
Tel. (212) 431-7473
aaron@moka.law
andrew@moka.law

*Attorneys for Plaintiffs*

Plaintiffs Jean-Claude Moustacakis and Izabela Olendska-Moustacakis (together, "Plaintiffs"), individually and on behalf of all others similarly situated (the "Class"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Pheton Holdings Ltd (n/k/a iTonic Holdings Ltd) ("PTHL" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by PTHL; (c) review and analysis of information disseminated by Defendants through online forums, group chats, and social media; and (d) review of other publicly available information concerning PTHL and similar entities.

## I.     NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of persons and entities that purchased or otherwise acquired PTHL securities between September 5, 2024, and July 29, 2025, inclusive (the "Class Period"). Plaintiffs pursue claims against PTHL, Jianfei Zhang, Zhixin Li, Pengfei Zhang, Cathay Securities, Inc., Dominari Securities LLC, and Marcum Asia CPAs LLP (collectively, "Defendants"), under the Securities Exchange Act of 1934 and the Securities Act of 1933.

2.     The Company is a holding company incorporated in the Cayman Islands. The Company conducts its purported business operations through an operating subsidiary, Beijing Feitian Zhaoye Technology Co., Ltd. ("Beijing Feitian"), which is based in the People's Republic of China (the "PRC" or "China"). During the Class Period, PTHL's principal executive offices were located at Room 306, NET Building, Hong Jun Ying South Road, Chaoyang District, Beijing, China.

1

3. The Company purports to develop and market treatment planning software ("TPS") to plan radiation treatment for cancer patients.

4. This case arises from the sudden collapse of the Company's stock on July 29, 2025, which followed an artificial price surge created through fraudulent stock promotions conducted in the months following the Company's initial public offering ("IPO").

5. The Company completed its IPO on September 5, 2024, selling 2,250,000 Class A ordinary shares at $4.00 per share for gross proceeds of $9,000,000.

6. The Company's share price increased from its $4.00 IPO price to an all-time intraday high of $32.00 per share on July 28, 2025, despite the absence of any material corporate developments or legitimate business prospects to justify such an enormous spike.

7. Investigations and public reports have revealed that the Company's stock was utilized in a market manipulation and "pump-and-dump" promotional scheme. Scammers posing as legitimate financial advisors touted the Company's shares in online forums, chat groups, and social media posts with baseless claims to create a buying frenzy among retail investors. The promoters circulated fabricated rumors that Gilead Sciences, Inc. (NASDAQ: GILD) ("Gilead") was preparing to acquire or partner with the Company with a transaction date of August 6, 2025.

8. On July 29, 2025, the Company's stock price collapsed approximately 95% to close at approximately $1.65 per share following multiple intraday halts by the NASDAQ Stock Market (the "NASDAQ") for volatility.

9. On August 1, 2025, the Company issued a press release (the "August 1 Press Release") acknowledging that its share price had been "influenced" by "false rumors" of a Gilead acquisition; admitting that it had had "no contact with Gilead, and any statements or reports suggesting otherwise were and are entirely false and fabricated"; and stating that it would "engage

2

with its market makers, Nasdaq, and relevant regulatory bodies for the purpose of holding responsible parties to the scheme accountable."

10. Throughout the Class Period, Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and the true nature of the trading activity in the securities. Specifically, Defendants failed to disclose to investors that: (1) PTHL was the subject of a market manipulation and fraudulent promotion scheme involving social-media based misinformation and impersonators posing as financial professionals; (2) PTHL's public statements and risk disclosures omitted any mention of intention to use fraudulent trading or the realized risk of market manipulation used to drive the Company's stock price; (3) as a result, the Company's securities were at unique risk of extreme price volatility and trading halts triggered by the manipulation scheme; (4) the Auditor Defendant and Underwriter Defendants had been involved with numerous foreign microcap public offerings that became targets of market manipulation schemes; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects were materially misleading and/or lacked a reasonable basis.

## II.    **JURISDICTION AND VENUE**

11. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

13. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein,

including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's agent for service of process, the Auditor Defendant, and the Underwriter Defendants (defined below) are located in this Judicial District.

14. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and/or indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. **PARTIES**

15. Plaintiffs Jean-Claude Moustacakis and Izabela Olendska-Moustacakis, as set forth in the accompanying certifications, incorporated by reference herein, purchased PTHL securities during the Class Period, and suffered substantial damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16. Defendant PTHL is a Cayman Islands exempted company with principal executive offices located in Beijing, China. The Company's Class A ordinary shares traded on the NASDAQ Capital Market under the symbol "PTHL" from September 5, 2024 through January 15, 2026. On January 13, 2026, the Company announced that it would change its corporate name from Pheton Holdings Ltd to iTonic Holdings Ltd, and change its ticker symbol to ITOC effective January 16, 2026.

17. Defendant Jianfei Zhang is the Company's founder, Chairman of the Board of Directors, and Chief Executive Officer.

18. Defendant Zhixin Li ("Li") is the Company's Chief Financial Officer.

4

19.    Defendant Pengfei Zhang has been a member of the Company's Board of Directors since March 2023 and is a director of the Company's subsidiary, Beijing Feitian. Pengfei Zhang is the brother of Defendant Jianfei Zhang.

20.    Defendant Marcum Asia CPAs LLP ("Marcum Asia" or the "Auditor Defendant") served as the Company's auditor in connection with its September 5, 2024 IPO, and served as the Company's auditor since at least the fiscal year ended December 31, 2022 through the end of the Class Period.

21.    Defendant Cathay Securities, Inc. ("Cathay") served as the lead representative underwriter on the Company's September 5, 2024 IPO. Cathay is headquartered within this District.

22.    Defendant Dominari Securities LLC ("Dominari" and, together with Cathay, the "Underwriter Defendants") served as co-underwriter on the Company's September 5, 2024 IPO. Dominari is headquartered within this District.

23.    Defendants Jianfei Zhang, Li, and Pengfei Zhang (together, the "Individual Defendants"), because of their positions within the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to the market. The Individual Defendants were provided with copies of the Company's public filings, reports, and press releases alleged herein to be materially misleading prior to, or shortly after, their issuance and had the ability, opportunity, and obligation to prevent their issuance or promptly correct them. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being

5

made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

24.    The Auditor Defendant issued a clean audit opinion on the Company's financial statements incorporated into the Registration Statement issued in connection with the Company's September 5, 2024, IPO. Additionally, Marcum Asia was the Company's auditor throughout the Class Period and had access to material non-public information. Because of its position, Marcum Asia knew or should have known that the adverse facts alleged herein had not been disclosed to and were being concealed from the investing public, and that the positive representations being made were materially false and/or misleading. Furthermore, due to its position, Marcum Asia had the ability and opportunity to prevent issuance of fraudulent SEC filings or cause them to be corrected. Therefore, the Auditor Defendant is also liable for the materially false and misleading statements and omissions pleaded herein.

25.    The Auditor Defendant served as auditor in connection with other recent foreign microcap initial public offerings sharing a similar profile to PTHL and that have experienced extreme trading volume and price volatility resulting in significant investor losses, including Jayud Global Logistics Limited (NASDAQ: JYD). On April 2, 2025, JYD's share price fell approximately 95% in a single trading session following fabricated acquisition rumors—a structurally identical "pump-and-dump" pattern that subsequently occurred with respect to the Company's shares.

26.    The Underwriter Defendants were identified as the lead representative underwriter and co-underwriter on the IPO at numerous points throughout the Prospectus (defined below). Cathay served as the representative underwriter and signatory on the underwriting agreement between the Company and the underwriters (the "Underwriting Agreement") and agreed to

conduct the IPO on a firm commitment basis. The Underwriter Defendants, based on their position, had the ability and opportunity to prevent the issuance of fraudulent SEC filings and/or cause them to be corrected. With this authority and by acting as book-running managers and representatives for the underwriters, Plaintiffs and the Class could and did reasonably attribute the materially misleading false statements and omissions contained in the Registration Statement (defined below) to the Underwriter Defendants, and accordingly, the Underwriter Defendants are also liable for the false statements and omissions pleaded herein.

27.    Defendant Cathay had served as underwriter or co-underwriter in other recent IPOs of similar foreign microcap companies that have experienced extreme trading volume and price volatility resulting in significant investor losses, including without limitation: Charming Medical Ltd. (trading suspended on November 12, 2025), TechCreate Group Ltd. (trading suspended February 2, 2026), Pitanium Ltd. (trading suspended October 6, 2025). Cathay's involvement in successive foreign microcap IPOs sharing the same structural features—low public float, dual-class capital structure, and concentration of voting power in offshore holding entities—placed it on notice of the manipulation risk to which its clients' securities were exposed.

28.    Similarly, Defendant Dominari served as underwriter or co-underwriter in recent IPOs of similar foreign microcap companies that have experienced extreme trading volume and price volatility resulting in significant investor losses, including without limitation: Wellchange Holdings, Diginex Ltd., and Everbright Digital. On March 8, 2026, Chairman John Moolenaar and Ranking Member Ro Khanna of the U.S. House of Representatives Select Committee on the Strategic Competition Between the United States and the Chinese Communist Party transmitted a written demand to Mr. Kyle Wool, the Chief Executive Officer of Dominari Securities, seeking information regarding Dominari's underwriting of initial public offerings by Chinese companies.

The March 8, 2026 letter expressly identified PTHL as an issuer for which Dominari Securities served as underwriter and as one of the Chinese issuers later associated with suspected manipulation.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Defendants Make Material Misstatements and Omissions in PTHL's Registration Statement and Prospectus

29.    The Class Period begins on September 5, 2024, when the Company filed its IPO Prospectus permitting the Company to issue 2,250,000 Class A ordinary shares at an initial offering price of $4.00 per share for a total capital raise of $9,000,000 (the "Prospectus"). In the Prospectus dated September 4, 2024, which formed part of the registration statement filed in connection with the IPO (the "Registration Statement"), the Company described its business as well as financial results for its different services, as follows:

> We are an exempted company with limited liability incorporated in the Cayman Islands on November 2, 2022. We are a holding company that has no material operations ourselves. As of the date of this prospectus, all of our business is conducted through our PRC operating entity, Beijing Feitian. We are committed to leveraging our products and services to establish a potential new standard of care across multiple malignant tumor applications.

> Beijing Feitian, our PRC operating entity, is a healthcare solution provider dedicated to the development and commercialization of brachytherapy TPS specifically used for radioactive particle implantation, a type of radiotherapy used in treating cancer patients by placing radioactive sources inside the patient that kill cancer cells and shrink tumors. Beijing Feitian's proprietary TPS is designed to promote the efficiency, accuracy, and safety of brachytherapy. TPS is generally a computer software used in different types of radiotherapy. In brachytherapy, radiation treatment planning is the process in which a team of professionals will plan the appropriate brachytherapy for cancer patients with malignant tumors. For the fiscal years ended December 31, 2022 and 2023, Beijing Feitian's revenue was generated through (i) the sales of FTTPS; and (ii) the sales of Medical Auxiliary Supplies.

FTTPS, the lead product of Beijing Feitian, is an advanced and user-oriented TPS for treating a wide variety of malignant tumors. FTTPS is also a modifiable and expandable TPS combined with proprietary algorithms open to more advanced features, such as 3D printing, and different deployment models adapted to fit patients' personalized needs. During the operation, FTTPS can determine the target volume, prescription dose, and dose limitation to protect OARs and produce a safe, effective, and accurate dose distribution plan for brachytherapy for cancer patients. This system simulates and calculates the treatment effect in preoperative planning, as well as over the course of treatments and upon the completion of the radioactive particle implants. Based on daily usage experience, the entire process, from image acquisition to the generation of an optimal treatment plan can be quickly completed, while allowing for the ability to re-plan while the patient is being treated. In rare cases, the processing may take longer than 60 minutes. We believe that the process of making iterative adjustments to a patient's treatment plan may become a trend for the treatment of most cancer patients with malignant tumors receiving internal radiation therapy in the future. As of the date of this prospectus, Beijing Feitian has registered FTTPS's software copyright and finished the registration as a Class III medical device. With TPS such as FTTPS, radiation therapists and medical physicists of hospitals can precisely destroy malignant tumor cells and reduce radiation exposure to surrounding healthy tissues, thus improving treatment outcomes.

30.   The Prospectus Summary included the following:

For the fiscal years ended December 31, 2022 and 2023, our total revenue was $679,777 and $628,591, respectively. For fiscal years ended December 31, 2022 and 2023, our gross profit was $558,150 and $470,828, respectively, and our gross profit margins were 82.11% and 74.90%, respectively. Beijing Feitian's revenue was derived from various sources, including (i) sales of FTTPS, and (ii) sales of Medical Auxiliary Supplies. Beijing Feitian's main focus is on the sales of FTTPS and related services.

31.   The Prospectus also disclosed the Company's dual-class capital structure, pursuant to which each Class A ordinary share entitled its holder to one (1) vote and each Class B ordinary share entitled its holder to twenty (20) votes. With respect to the resulting concentration of voting power in Defendant Jianfei Zhang, the Prospectus stated as follows:

9

Immediately following this offering and the application of net proceeds from this offering, our Chief Executive Officer, Mr. Jianfei Zhang, will control approximately 95.97% of the combined voting power of our equity interests through the ordinary shares held by ZJW (BVI) LTD and BANYAN (BVI) LTD.

32.    The Prospectus also contained financial results for fiscal 2022 and 2023, as well as the Report of Independent Registered Public Accounting Firm signed by the Auditor Defendant regarding those financial results. Specifically, the Auditor Defendant reported the following:

Opinion on the Financial Statements

We have audited the accompanying consolidated balance sheets of Pheton Holdings Ltd (the "Company") as of December 31, 2022 and 2023, the related consolidated statements of income(loss) and comprehensive income(loss), changes in shareholders' equity and cash flows for each of the years in the two-year period ended December 31, 2023, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022 and 2023, and the results of its operations and its cash flows for each of the years in the two-year period ended December 31, 2023, in conformity with accounting principles generally accepted in the United States of America.

Basis for Opinion

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of

10

expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Marcum Asia CPAs LLP
We have served as the Company's auditor since 2022.
New York, New York
May 2, 2024

33.    The Prospectus also provided information regarding the Company's purported

"Strengths[,]" which included the following:

***Leading TPS provider in China to capture the market opportunity.***

According to Frost & Sullivan, the market size of TPS in China is expected to reach $320.7 million in 2026. According to the F&S report, there are four domestic brachytherapy TPS products approved in China by the National Medical Products Administration (NMPA), and Beijing Feitian's FTTPS is considered technologically advanced and has a wide range of clinical indications. FTTPS is widely used in diseases caused by many types of malignant tumors, including but not limited to prostate cancer, lung cancer, pancreatic cancer, liver cancer, esophageal cancer, and breast cancer. In 2021, Beijing Feitian had a market share of 60.2% based on the total number of brachytherapy TPS used in Chinese hospitals, according to Frost & Sullivan.

***Formidable entry barrier.***

We are in an industry with multiple entry barriers, including technical, industry, and R&D barriers. According to Frost & Sullivan's analysis, TPS is a multi-disciplinary technology, a comprehensive skillset and knowledge are required to meet the first-class standard and the long-term usage satisfaction from the users. The high technical barriers of TPS makes it difficult for new entrants to achieve a technological breakthrough. Additionally, obtaining a

11

product registration license in China from the NMPA requires extensive efforts, including testing by a local authorized test lab and local clinical trials. NMPA has also introduced policies to raise the entry barrier for medical devices in China to promote the healthy development of the medical device industry. Furthermore, the high R&D barriers of TPS require professional technicians to develop an accurate and efficient algorithm supported by a large amount of clinical data, computer programming, and numerous calculations and iterations. According to the F&S report, there are 9 TPS products for brachytherapy that have been approved for marketing. Despite this, we believe that our mature and commercialized FTTPS has scaled the high entry barrier, setting us apart from competitors given the long R&D cycle of products in our industry. Through years of research, development, and consultation with third-party experts, we believe that our proprietary design concept cannot be easily replicated without years of research and experience.

### *Visionary team leader with deep industry experience.*

Led by CEO, Mr. Jianfei Zhang, Beijing Feitian has more than 20 years' of experience in the medical device and computer software industry. Utilizing his extensive experience in the intersection of oncology, nuclear medicine and software design, Mr. Jianfei Zhang has developed a strong understanding of domestic markets and customer needs. Mr. Jianfei Zhang has also accumulated a wealth of experience in corporate governance and corporate development, providing a solid foundation for our development in our industry segment.

### *Commitment to quality control.*

We attach importance to product quality and adhere to stringent quality control measures. Beijing Feitian has implemented a comprehensive quality control system in accordance with the internationally recognized requirements, ISO 9001:2015, to ensure that every step of the business operation is strictly monitored and managed. We plan to continue to maintain and strengthen the quality control systems throughout Beijing Feitian's operations, closely monitor product quality and market feedback, keep daily operational records, and comply with national and local laws and regulations on product quality, labor and environmental sustainability.

34.    The Prospectus also addressed the Company's purported "Growth Strategies[,]" stating as follows:

12

### *Enhance our ability to attract, incentivize and maintain good relationships with talented professionals.*

We believe our success greatly depends on our ability to attract, incentivize and maintain long-term relationships with talented professionals. To maintain and improve our competitive advantage in the market, we plan to implement a series of initiatives to attract additional personnel and to retain mid- to high-level personnel, including formulating a market-oriented employee compensation structure and implementing a standardized multilevel performance review mechanism. In addition, we aim to keep long-term relationships with third-party development teams or experts. As part of this effort, Beijing Feitian has established collaborative relationships with third-party developers, including Beijing Sovio Medical Technology Co. Ltd., TEAMSMART INTERNATIONAL LTD ("Teamsmart") and Zhengyu Liu, to develop software. Beijing Feitian has entered into several agreements with these outside experts to acquire the copyright and any other rights derived therefrom of developed software and receive continuous software upgrades, improvements, and maintenance. Further details on these agreements can be found in "— Research and Development." We believe these outside experts provide valuable technical support, shared research capacity, database and operational know-how to drive sustainable growth of the business and strengthen our ability to innovate.

### *Continue to invest in research and development.*

We attribute part of our success to our continued investment in and focus on R&D. Over the two fiscal years ended December 31, 2022 and 2023, Beijing Feitian has invested a total of approximately $158,191 in the ongoing functional development of FTTPS. Our outsourced R&D in 2023 focused specifically on an AI recognition feature within FTTPS, which is aimed to identify malignant tumors and sensitive structures surrounding them, thereby improving the quality and accuracy of FTTPS in general. Looking ahead, we plan to further invest capital in R&D to enhance our technology and develop a new generation system that will incorporate new features into our existing FTTPS. We also plan to develop artificial intelligence surgical robotic devices. In the era of precision medicine, we expect to realize the precise layout of particle implantation through robot-based devices by combining the technological developments of robotics with our existing TPS to facilitate dose accuracy and surgical standardization.

13

***Expand into overseas markets, notwithstanding all of Beijing Feitian's revenues are presently generated in China.***

Beijing Feitian's sales and marketing efforts have been primarily focused on the PRC domestic market. As of December 31, 2023, Beijing Feitian had 212 systems installed in China. To expand its market reach and increase sales, Beijing Feitian intends to gradually introduce its products to the Southeast Asian market in the foreseeable future. Beijing Feitian expects to cooperate with Southeast Asian hospitals to promote its products and services, where it will begin to explore sales capabilities in Southeast Asia. In 2021 and 2022, Beijing Feitian developed an expansion plan for the Southeast Asian market, with Vietnam identified as the primary country for its initial outreach, and successfully obtained the Export Certificate for its FTTPS in 2021 in anticipation of this expansion. However, this plan was halted due to travel restrictions resulting from the COVID-19 pandemic. As of the date of this prospectus, Beijing Feitian has not entered into agreements with any entities in the Southeast Asian market. Moving forward, once the expansion plan is reinitiated, Beijing Feitian intends to establish partnerships with healthcare providers and distributors across other Southeast Asian countries. This strategy is expected to enable Beijing Feitian to gain more profound insights into local market needs and to tailor its product offerings more effectively for these new markets.

***Create new revenue channels through upgrade services for FTTPS.***

We plan to generate additional revenue by offering upgrade services for our next-generation FTTPS. FTTPS is an expandable software and can be customized to meet the evolving demands of the market as Chinese nuclear medicine and other related disciplines continue to develop. For example, although the isotope generally used in China for radioactive particle implantation is Iodine-125, Beijing Feitian has embedded FTTPS with a database for newly-introduced isotopes, such as Iridium-192 and Palladium-103, which reflects the trend in nuclear medicine development. Isotopes are different forms of the same chemical element, each having a different number of neutrons in its nucleus. As new functionalities such as the newly-introduced database for isotopes are developed, we can offer upgrade services on top of the existing FTTPS for a fee, thereby generating additional revenue and creating value for our customers.

35.     The Prospectus also included vague, boilerplate disclosures regarding risk factors that could hypothetically adversely affect the Company and its investors, including the following:

***We may experience extreme share price volatility unrelated to our actual or expected operating performance, financial condition or prospects, making it difficult for prospective investors to assess the rapidly changing value of our Class A ordinary shares.***

Recently, there have been instances of extreme stock price run-ups followed by rapid price declines and strong stock price volatility with a number of recent initial public offerings, especially among companies with relatively smaller public floats. As a relatively small-capitalization company with relatively small public float, we may experience greater share price volatility, extreme price run-ups, lower trading volume and less liquidity than large-capitalization companies. In particular, our Class A ordinary shares may be subject to rapid and substantial price volatility, low volumes of trades and large spreads in bid and ask prices.

Such volatility, including any stock-run up, may be unrelated to our actual or expected operating performance, financial condition or prospects, making it difficult for prospective investors to assess the rapidly changing value of our Class A ordinary shares. In addition, if the trading volumes of our Class A ordinary shares are low, persons buying or selling in relatively small quantities may easily influence prices of our Class A ordinary shares.

\*          \*          \*          \*          \*

The trading price of our Class A ordinary shares may be volatile and could fluctuate widely due to factors beyond our control. This may happen because of broad market and industry factors. In addition, securities markets may from time to time experience significant price and volume fluctuations that are not related to our operating performance, which may have a material and adverse effect on the trading price of our Class A ordinary shares.

In addition to market and industry factors, the price and trading volume for our Class A ordinary shares may be volatile for factors specific to our own operations, including the following:

•      actual or anticipated fluctuations in our quarterly results of operations and changes or revisions of our expected results;

•      variations in our revenues, earnings and cash flow;

15

- announcements of studies and reports relating to the quality of our product offerings or those of our competitors;

- our or our competitors' announcements of new investments, acquisitions, strategic partnerships, joint ventures, capital raisings or capital commitments;

- changes in the economic performance or market valuations of similar companies;

- changes in financial estimates by securities analysts;

- failure on our part to realize monetization opportunities as expected;

- additions or departures of key personnel;

- fluctuations of exchange rates between Renminbi and the U.S. dollar;

- release or expiry of lock-up or other transfer restrictions on our outstanding equity securities or sales of additional equity securities;

- sales or perceived potential sales of additional ordinary shares;

- detrimental negative publicity about us, our management, our competitors or our industry;

- regulatory developments affecting us or our industry, customers or suppliers; and

- actual or potential litigation or regulatory investigations.

Any of these factors may result in large and sudden changes in the trading volume and price of our Class A ordinary shares.

***The price of our Class A ordinary shares may be volatile, even regardless of our operating performance, and you may lose all or part of your investment.***

The market price of our shares could fluctuate significantly, and you may not be able to resell your shares at or above the offering price. Those fluctuations could be based on various factors in addition to those otherwise described in this prospectus, including those

16

described under "— *Risks Relating to Our Business and Operations*" and the following:

• our operating performance and the performance of our competitors in general;

• the public's reaction to our press releases, our other public announcements and our filings with the SEC;

• changes in earnings estimates or recommendations by research analysts who follow us or other companies in our industry;

• global, national or local economic, legal and regulatory factors unrelated to our performance;

• the number of shares to be publicly traded after this offering;

• future sales of our Class A ordinary shares by our officers, directors and significant shareholders;

• the arrival or departure of key personnel; and

• other developments affecting us, our industry or our competitors

• other actual or anticipated fluctuations in our quarterly results of operations and changes or revisions of our expected results;

36.    Additionally, the Company issued boilerplate risk disclosures concerning its internal controls and the implementation thereof:

> **We identified two material weaknesses in Beijing Feitian's internal control over financial reporting. If we are unable to remediate this material weakness, or if we identify additional material weaknesses in the future or otherwise fail to maintain an effective system of internal controls, we may not be able to accurately or timely report our financial condition or results of operations, which may adversely affect our business and share price.**
>
> Prior to this offering, we were a private company with limited accounting personnel and other resources with which to address our internal control over financial reporting. Our independent registered public accounting firm has not conducted an audit of our internal control over financial reporting. However, in preparing our audited consolidated financial statements for the fiscal years ended December 31, 2022 and 2023, we and our independent registered

17

public accounting firm identified two material weaknesses in our internal control over financial reporting. As defined in the standards established by the PCAOB, a "material weakness" is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.

The material weaknesses identified are related to (i) our lack of sufficient personnel with appropriate levels of accounting knowledge and experience to address complex U.S. GAAP accounting issues and to prepare and review financial statements and related disclosures under U.S. GAAP, and (ii) our lack of formal policies and procedures to establish risk assessment processes and an internal control framework.

Upon the completion of this offering, we will be a public company in the United States subject to the Sarbanes-Oxley Act of 2002. Section 404 of the Sarbanes-Oxley Act, or Section 404, will require that we include a report from management on the effectiveness of our internal control over financial reporting in our second annual report on Form 20-F. In addition, once we cease to be an "emerging growth company" as such term is defined in the JOBS Act, our independent registered public accounting firm must attest to and report on the effectiveness of our internal control over financial reporting. Moreover, even if our management concludes that our internal control over financial reporting is effective, our independent registered public accounting firm, after conducting its own independent testing, may issue a report that is qualified if it is not satisfied with our internal controls or the level at which our controls are documented, designed, operated or reviewed, or if it interprets the relevant requirements differently from us. In addition, as a public company, our reporting obligations may place a significant strain on our management, operational and financial resources and systems for the foreseeable future. We may be unable to timely complete our evaluation testing and any required remediation.

During the course of documenting and testing our internal control procedures, in order to satisfy the requirements of Section 404, we may identify other weaknesses and deficiencies in our internal control over financial reporting. If we fail to maintain the adequacy of our internal control over financial reporting, as these standards are modified, supplemented or amended from time to time, we may not be able to conclude on an ongoing basis that we have effective internal control over financial reporting in accordance with Section 404. Generally speaking, if we fail to achieve and maintain an effective internal control environment, it could result in material misstatements in our financial statements and could also impair our

ability to comply with applicable financial reporting requirements and related regulatory filings on a timely basis. As a result, the trading price of our Class A ordinary shares may be materially and adversely affected. Additionally, ineffective internal control over financial reporting could expose us to increased risk of fraud or misuse of corporate assets and subject us to potential delisting from the stock exchange on which we list, regulatory investigations and civil or criminal sanctions. We may also be required to restate our financial statements from prior periods.

\*          \*          \*          \*          \*

***Our lack of effective internal controls over financial reporting may affect our ability to accurately report our financial results or prevent fraud which may affect the market for and price of our Class A ordinary shares.***

To implement Section 404 of the Sarbanes-Oxley Act of 2002, the SEC adopted rules requiring public companies to include a report of management on the company's internal control over financial reporting. We are a private company with limited accounting personnel and other resources for addressing our internal control over financial reporting. Our management has not completed an assessment of the effectiveness of our internal control over financial reporting and our independent registered public accounting firm has not conducted an audit of our internal control over financial reporting. However, in preparing our audited consolidated financial statements for the fiscal years ended December 31, 2022 and 2023, we identified material weaknesses in our internal control over financial reporting, as defined in the standards established by the PCAOB as of December 31, 2022 and 2023. The material weakness identified related to limited accounting staff and resources with appropriate knowledge of accounting principles generally accepted in the United States of America ("U.S. GAAP") and SEC reporting and lack of sufficient documented financial closing policies and procedures.

As of the date of this prospectus, we have implemented measures and intend to continue to implement measures designed to improve our internal control over financial reporting to address the underlying causes of these material weaknesses, including (i) hiring additional qualified accounting personnel with relevant U.S. GAAP and SEC reporting experience and qualifications to strengthen the financial reporting function and to set up a financial and system control framework; (ii) expanding the capabilities of existing accounting and financial personnel through implementing regular and continuous U.S. GAAP training programs; (iii) preparing

comprehensive accounting policies, manuals and closing procedures to improve the quality and accuracy of our period-end financial closing process; and (iv) appointing independent directors, establishing an audit committee, and strengthening corporate governance.

Upon the completion of this offering, we will be subject to the requirement under Section 404 of the Sarbanes-Oxley Act that we maintain internal controls and that management perform periodic evaluation of the effectiveness of the internal controls. Effective internal control over financial reporting is important to prevent fraud. As a result, our business, financial condition, results of operations and prospects, as well as the market for and trading price of our Class A ordinary shares, may be materially and adversely affected if we do not have effective internal controls. We may not discover any problems in a timely manner and current and potential shareholders could lose confidence in our financial reporting, which would harm our business and the trading price of our Class A ordinary shares. The presence of material weaknesses in our internal controls over financial reporting may inhibit investors from purchasing our Class A ordinary shares and may make it more difficult for us to raise funds in a debt or equity financing.

In accordance with the provisions of the JOBS Act, we and our independent registered public accounting firm were not required to, and did not, perform an evaluation of our internal control over financial reporting as of December 31, 2022 and 2023. Accordingly, we cannot assure you that we have identified all, or that we will not in the future have additional, material weaknesses. Material weaknesses may still exist when we report on the effectiveness of our internal control over financial reporting, as required under Section 404 of the Sarbanes-Oxley Act after the completion of this offering.

If we identify such issues or if we are unable to produce accurate and timely financial statements, our stock price may decline and we may be unable to maintain compliance with the Nasdaq Listing Rules.

37.    With respect to the reasons behind the Company's IPO, the Prospectus stated the following regarding its intentions post-IPO and how it would use the net proceeds:

We estimate that we will receive net proceeds from this offering of approximately $6,830,000, or approximately $8,072,000 if the underwriters exercise their option to purchase additional shares,

after deducting underwriting discounts and the estimated offering expenses payable by us. These estimates are based upon an initial public offering price of $4.00 per Class A ordinary share.

The primary purposes of this offering are to create a public market for our shares for the benefit of all shareholders and obtain additional capital. We plan to use the net proceeds of this offering as follows:

- approximately 30% for research and development, technology upgrade;

- approximately 30% for market expansion;

- approximately 20% for improvements to our internal control and operation system; and

- approximately 20% for supplemental liquidity.

\*          \*          \*          \*          \*

The foregoing represents our current intentions based upon our present plans and business conditions to use and allocate the net proceeds of this offering. Our management, however, will have broad discretion in the application of our net proceeds from this offering, and investors will be relying on the judgment of our management regarding the application of these proceeds. See "RISK FACTORS — *Risks Related to the Class A Ordinary Shares and this Offering — You must rely on the judgment of our management as to the use of the net proceeds from this offering, and such use may not produce income or increase the price of our Class A ordinary shares*" To the extent that the net proceeds we receive from this offering are not immediately applied for the above purposes, we plan to invest the net proceeds in bank deposits and low-risk bank financial products.

38.    The statements identified above in the foregoing paragraphs were and are false and misleading because the statements failed to disclose that: (1) PTHL was the subject of a market manipulation and fraudulent promotion scheme involving social-media based misinformation and impersonators posing as financial professionals; (2) PTHL's public statements and risk disclosures omitted any mention of intention to use fraudulent trading or the realized risk of market

21

manipulation used to drive the Company's stock price; (3) as a result, PTHL securities were at unique risk of a sustained halt in trading by either of the SEC or NASDAQ; (4) the Auditor Defendant and Underwriter Defendants had been involved with numerous foreign microcap public offerings that were utilized in market manipulation schemes; (5) the Company lacked proper internal controls over financial reporting and accounting personnel to maintain compliance with GAAP and SEC requirements; and (6) as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects were materially misleading and/or lacked a reasonable basis.

39.    The Auditor and Underwriter Defendants knew of and/or recklessly disregarded the existence of these falsities, enabling the scam by endorsing the IPO, and issuing PTHL shares.

40.    Each of the Individual Defendants signed the Registration Statement. The Prospectus contains the signature of the Auditor Defendant with respect to its opinion and report on the Company's financial statements. The Prospectus identifies Cathay as the lead representative underwriter for the IPO. Cathay was party and sole signatory to the Underwriting Agreement filed as Exhibit 1.1 to the Form F-1/A Registration Statement, which entitled the underwriters to review any amendment or supplement to the Registration Statement and Prospectus before filing. Accordingly, the Auditor Defendant and Underwriter Defendants had the opportunity to review the Registration Statement and Prospectus before filing.

### B.    The Market Manipulation Scheme Starts to Unfold

41.    As far back as November 2022, FINRA was warning of a "heightened threat of fraud" in "small-capitalization IPOs," with "primary operations in China" like PTHL.[1]    As gatekeepers to U.S. markets, the Underwriter Defendants were duty-bound to keep abreast of these

---

[1] https://www.finra.org/rules-guidance/notices/22-25.

updates as part of their due diligence and by "pay[ing] close attention to suspicious trends in the

marketplace and how they may affect members' obligations" as well as "continuously evaluat[ing]

and adapt[ing] their supervisory systems as well as compliance and risk management programs to

ensure that they are monitoring for and addressing this threat."[2]   Failure to do so "subjects

underwriters to potential liability under Sections 11 and 12 of the Securities Act of 1933, providing

a strong incentive for underwriters to help ensure the accuracy of disclosures in registration

statements."[3]

42.     FINRA's November 2022 notice goes on to detail "the following elements" as clear

"red flags" to alert underwriters of a foreign micro-cap IPO "ramp-and-dump" scam:[4]

- ***Small Market Capitalization and Limited Public Float*** *– Each IPO typically raised less than $25 million and valued each issuer at less than $100 million, with the IPO typically issuing fewer than 20 million shares.*

- ***Foreign Issuers*** *– Many issuers or their operating subsidiaries or affiliates maintained primary operations in China, but some issuers also based their operations in other countries.*

- ***Foreign Broker-Dealers*** *– Foreign broker-dealers, primarily based in Hong Kong, have allocated or been allocated significant amounts of the shares, sometimes as much as 90 percent or more of the shares. The practice of allocating a majority of the shares issued in an IPO to foreign broker-dealers may limit the supply of the public float available to the market on the day of the IPO and during the price increase phase of ramp-and-dump schemes.*

- ***Concentrated Allocations of IPO Shares*** *– Underwriters and selling group members (including foreign broker-dealers) may be allocating the majority of shares to a small number of investors, leading to a concentration of shares being held in very few hands.*

- ***Nominee Accounts*** *– Nominee accounts, primarily accounts opened for foreign nationals, have been opened at U.S. broker-dealers to invest in IPOs and later place*

---

[2] *Id.*

[3] *Id.* (citing SEC Release on Proposed Rules for Special Purpose Acquisition Companies, Shell Companies, and Projections, Release Nos., 33-11048, 34-94546, IC-34549, File No. S7-13-22 (Mar. 30, 2022)).

[4] *Id.*

*manipulative orders and trades to inflate aftermarket prices. These accounts raise potential concerns, including:*

- *account holders' possible lack of awareness that their identities were being used to open the accounts;*
- *apparent contradictions between customers' trading activity and their ages, occupations, investment experience, financial status and sources of funding;*
- *indicators that funding for initial IPO customer accounts are being financed, directly or indirectly, by the issuer or other third parties, including through potential loans; and*
- *possible centralized control over a group of nominee accounts, which can be identified through indicators such as:*
  - *similar timing of account opening;*
  - *similar referral source or point of contact for accounts;*
  - *similar customer contact information;*
  - *similar bank account information;*
  - *similar IP addresses;*
  - *similar initial account funding amounts;*
  - *similar amounts of indications of interest for IPOs; and*
  - *multiple customers or accounts placing layered buy limit orders at or around the same time, at prices higher than the IPO price, and frequently in odd-lot amounts or other "red flags" of pre-arranged or coordinated trading.*

- ***Foreign Omnibus Accounts*** *– Omnibus accounts at U.S. broker-dealers maintained for foreign financial institutions, including foreign broker-dealers, have been observed liquidating large amounts of shares of the small-cap issuers at the peak of price spikes associated with suspected ramp-and-dump schemes. In some cases, the accounts in question did not trade the securities at all until significant price increases occurred and appeared to time their sales for when the stock price peaked.*

- ***Significant Price Spikes and Drops*** *– Most shares of issuers that are the subject of suspected ramp-and-dump schemes experienced significant price increases in the opening trade on an exchange and in continuous trading on the day of, or days immediately following, the listing. These price increases did not appear to be driven by news or material events. After the spike, the price quickly declined to a level at or below the offering price.*

- ***Allegations of Social Media Scams*** *– Investors in securities that are the subject of suspected ramp-and-dump schemes (including investors in the IPOs) have complained about investing in a ramp-and-dump scheme through so-called "pig butchering." These schemes sometimes begin with a seemingly misdirected text message or message on a social media messaging application leading to a relationship (sometimes romantic in nature) between victims and bad actors. After a relationship is established, the bad actor will make a recommendation to the victim to place limit orders in certain securities at a specific time and price.*

43.    FINRA notes this list is not exclusive or exhaustive.  Specifically, that "the schemes are evolving, and members should pay close attention to suspicious trends in the marketplace and how they may affect members' obligations. FINRA encourages members to continuously evaluate and adapt their supervisory systems as well as compliance and risk management programs to ensure that they are monitoring for and addressing this threat."[5]

44.    For response procedures, FINRA goes on to detail exactly what underwriters of securities should implement to maintain compliance in the face of these social media based "ramp-and-dump" or pump-and-dump schemes:[6]

> *In the context of ramp-and-dump schemes, moreover, members should consider their obligations under the Bank Secrecy Act (BSA), its implementing regulations and FINRA Rule 3310 (Anti-Money Laundering Compliance Program), including to:*
>
> - *maintain customer identification programs to verify the identity of each customer;[7]*
> - *verify the identity of the beneficial owners of legal entity customers;[8]*
> - *establish due diligence programs for correspondent accounts for foreign financial institutions, including omnibus accounts held for foreign financial institutions;[9]*
> - *establish and implement policies and procedures that can be reasonably expected to detect and cause the reporting of suspicious transactions conducted or attempted by, at, or through U.S. broker-dealers to the U.S. Treasury Department's Financial Crimes Enforcement Network (FinCEN);[10] and*
> - *implement appropriate risk-based procedures for conducting ongoing customer due diligence, including to understand the nature and purpose of customer relationships for the purpose of developing a customer risk profile, and to conduct ongoing monitoring to identify and report suspicious transactions.[11]*

---

[5] *Id.*

[6] *Id.*

[7] *See* FINRA Rule 3310(b) and 31 C.F.R. § 1023.220.

[8] *See* FINRA Rule 3310(f)(ii) and 31 C.F.R. §1010.230.

[9] *See* FINRA Rule 3310(b) and 31 C.F.R. § 1010.610; *c.f.* SEC Staff Bulletin: Risks Associated with Omnibus Accounts Transacting in Low-Priced Securities, https://www.sec.gov/tm/risks-omnibus-accounts-transacting-low-priced-securities.

[10] *See* FINRA Rule 3310(a) and 31 C.F.R. § 1023.320.

[11] *See* FINRA Rule 3310(f) and 31 C.F.R. § 1023.210(a)(5).

25

*Upon detection of red flags related to ramp-and-dump schemes through monitoring, members should consider whether additional investigation, customer due diligence measures or a Suspicious Activity Report (SAR) filing may be warranted. Members also should consider whether, depending on the facts and circumstances, other obligations may be implicated, including, but not limited to the following*

- *Exchange Act Rule 10b-5; Securities Act, Section 17(a); and FINRA Rule 2020 (Use of Manipulative, Deceptive or Other Fraudulent Devices);*
- *FINRA Rule 2010 (Standards of Commercial Honor and Principles of Trade);*
- *FINRA Rule 2090 (Know Your Customer);*
- *FINRA Rule 3110 (Supervision);*
- *FINRA Rule 4512 (Customer Account Information);*
- *FINRA Rule 5130 (Restrictions on the Purchase and Sale of Initial Equity Public Offerings);*
- *FINRA Rule 5131 (New Issue Allocations and Distributions);*
- *SEC Regulation M;*
- *SEC Market Access Rule, Securities Exchange Act Rule 15c3-5; and*
- *SEC Identity Theft Red Flags Rule, Regulation S-ID.*

45.    The Company's low-float IPO, which carried all these "red flags," was carefully designed to facilitate market manipulation, and was a clear "ramp-and-dump" scheme. By offering just 2,250,000 Class A shares to the public, Company insiders and co-conspirators were able to benefit from the scheme through offshore holding entities and affiliates. The scarce public float allowed for price manipulation because even modest buying pressure could create explosive price movement. Had the Underwriter Defendants conducted even basic due diligence, much less complied with the aforementioned due-diligence procedures FINRA requires, they would have uncovered this fraud at the outset and prevented the IPO from ever happening. Likewise, had the Auditor Defendant conducted even basic due diligence, much less complied with the PCAOB standards with which it claimed to comply, it would also have detected this obvious fraud preventing registration and sale of PTHL securities.

46.    On April 22, 2025, PTHL filed a Form S-8 Registration Statement registering 2,800,000 Class A ordinary shares for issuance under the Company's 2025 Equity Incentive Plan.

26

The registered shares were not subject to any lock-up and were freely tradeable upon issuance. The April 22, 2025 Form S-8 was signed by the Individual Defendants.

47.    Based on the Company's Unaudited Interim Condensed Consolidated Financial Statements for the Six Months Ended June 30, 2025 (Exhibit 99.1 to the 6-K filed December 16, 2025) the Company issued the 2,800,000 shares on May 12, 2025 to unnamed "independent consultants" and "service providers."

48.    On May 12, 2025, PTHL's daily trading volume reached 1,722,100 shares, a more than 7,000% increase from the April 22, 2025 figure of 23,500.

49.    Following the May 12, 2025 issuance, PTHL's stock price rose from $4.76 per share to $8.90 per share by June 5, 2025, an increase of approximately 87%.

50.    The upward trajectory of the Company's stock price continued, reaching a Class Period intraday high of $32.00 per share on July 28, 2025, an increase of over 500% in share price from May 12, 2025.

51.    The stock price increase was fueled by a coordinated effort on social media and messaging applications, such as WhatsApp, to "pump" PTHL and was led by stock promoters posing as financial advisors. Based on information and belief, these stock promoters used aliases and false photographs to conceal their true identities and were key cogs in the stock manipulation scheme surrounding PTHL, along with Defendants identified herein.

52.    These stock promoters targeted investors on social media via advertisements and posts, which solicited them to join stock trading and tips "groups" on messaging applications. After an initial solicitation, when an investor contacted the group about joining, a stock promoter posing as a financial advisor within the group would tout professional stock analysis and advisory services and a purported track record of prior returns to convince the investor to follow their advice

27

and join the group. The promoters often offered prospective investors a free trial period, after which they could formally join the group as fee-paying members if they were satisfied with the services provided.

53. For example, in one group called "Blue Chip Investment Community," the stock promoters claimed to be representatives of Silver Oak Securities, Inc. (a legitimate, FINRA-registered firm). They offered "90 working days of free services for investors who have just joined the community," including "[d]aily market analysis"; "[p]ortfolio diagnosis and optimization" by "professional CFA licensed analysts"; "[d]iversified investment strategies"; and "[o]ne-to-one" support from dedicated assistants.

54. The promoters within Blue Chip Investment Community further represented that group members would receive periodic stock recommendations consisting of "[s]hort-term US stock trading" with a holding period of 10 trading days, as well as "[e]vent-driven investment," with a holding period of 20-50 days. They touted that the latter would generate "150% - 350% investment return."

55. Beginning in late June 2025, the promoters pitched PTHL to group members as an "event-driven investment." To support their recommendation, they offered a combination of technical analysis of PTHL's stock price trends and trading data and fundamental analysis of the Company's business and prospects. They noted strong demand and a growing market for the Company's radiotherapy TPS, as well as the strength of the Company's "professional technical team," its "experienced R&D team," and its "in-depth cooperative relationships with some well-known healthcare giants," which provided the Company a "competitive advantage" and the ability "to obtain clinical feedback to improve its products."

56.     The promoters continued to recommend investment in PTHL through the end of June and into July 2025, encouraging investors to "maximize" their investment by liquidating other investments and transferring additional assets from other accounts, claiming this would ensure investors achieved the largest profit. When investors confirmed that they purchased the stock as instructed, the promoters instructed them to provide screenshots of their transactions confirming their ownership of PTHL and then encouraged the investors to purchase even more PTHL shares the following day.

57.     In late July 2025, to induce further purchases of PTHL shares, the stock promoters touted a fabricated impending "partnership" between the Company and Gilead, a multinational biopharmaceutical company with a market capitalization of over $150 billion and no actual business relationship with the Company. The promoters claimed the partnership was a strategic foundation for "PTHL to leverage the advantages of industry giants to achieve technological breakthroughs, market expansion and ecological upgrades in the next 3-5 years," leading PTHL to "achieve a qualitative leap and become an emerging force" in the cancer treatment industry.

58.     The promoters represented the Gilead partnership would be announced on or about August 6, 2025, and they continued to recommend additional purchases of PTHL shares through the end of July 2025 in anticipation of a significant increase in the stock price following announcement of the partnership. Indeed, on the morning of July 29, 2025—just hours before PTHL's stock price collapsed—the promoters recommended group members "seize the opportunity to buy at a low price," setting a price target of $70-$75 per share and projecting returns of 200%-400%.

59.     The statements identified above in the foregoing paragraphs were and are false and misleading because the statements failed to disclose that: (1) PTHL was the subject of a market

manipulation and fraudulent promotion scheme involving social-media based misinformation and impersonators posing as financial professionals; (2) PTHL's public statements and risk disclosures omitted any mention of intention to use fraudulent trading or the realized risk of market manipulation used to drive the Company's stock price; (3) as a result, PTHL securities were at unique risk of a sustained halt in trading by either of the SEC or NASDAQ; (4) the Auditor Defendant and Underwriter Defendants had been involved with numerous foreign microcap public offerings that were utilized in market manipulation schemes; (5) the Company lacked proper internal controls over financial reporting and accounting personnel to maintain compliance with GAAP and SEC requirements; and (6) as a result of the foregoing, Defendants' positive statements about the Company's business, operations and prospects were materially misleading and/or lacked a reasonable basis.

### C.      The Truth Is Revealed

60.      On the morning of July 29, 2025, The Bear Cave, an independent investigative publication, published a report concerning the Company's stock entitled "Problems at Pheton Holdings (PTHL)" and subtitled "Regulators should halt PTHL before U.S. investors lose millions."[12]  The report identified three contemporaneous and structurally identical pump-and-dump schemes against similarly situated U.S.-listed Chinese microcap issuers: (i) Ostin Technology Group Co., Ltd. (NASDAQ: OST), which fell approximately 94% on June 26, 2025 following fabricated rumors of an acquisition by Universal Display Corp.; (ii) China Liberal Education Holdings Limited (NASDAQ: CLEU), which fell approximately 98% on January 30, 2025 following fabricated rumors of an acquisition by Stride, Inc.; and (iii) Jayud Global Logistics

---

[12] Edwin Dorsey, *Problems at Pheton Holdings (PTHL)*, The Bear Cave (July 29, 2025), https://thebearcave.substack.com/p/problems-at-pheton-holdings-pthl.

Limited (NASDAQ: JYD), which fell approximately 95% on April 2, 2025 following fabricated rumors of an acquisition by Matson, Inc.

61.    Following publication of The Bear Cave report, the Company's share price collapsed. As reported by Bloomberg News, the Company's Class A ordinary shares had closed on Monday, July 28, 2025 at $30.96 and opened on Tuesday, July 29, 2025 at $31.25, "drifting slightly higher." Then, "around 12:26 p.m. in New York, they suddenly sank 11% and triggered a volatility halt." When trading resumed approximately 90 minutes later, the stock's plunge reached 89% before trading was halted again. "Over the course of Tuesday afternoon, Pheton resumed trading and was halted at least eight more times, as it extended its decline to 95%." The Company's shares ended the day at $1.65, with a market capitalization of $40.8 million, down from $765 million the prior trading day.[13]

62.    On August 1, 2025, the Company furnished a Form 6-K to the SEC attaching, as Exhibit 99.1, a press release entitled "Pheton Holdings Ltd Issues Statements Addressing Recent Market Activity and Misleading Rumors." In the August 1 Press Release, the Company stated, in pertinent part:

> Over the past few days, shares of Pheton have experienced an extraordinary and unexpected decline in its share price, which the Company believes may have been triggered by a speculative article published by The Bear Cave on July 29, 2025. The article asserts that Pheton's share price may have been influenced by false rumors of a potential acquisition by Gilead Sciences, Inc. ("Gilead").
>
> Pheton's management team unequivocally and categorically denies any involvement in, or knowledge of, any form of stock price manipulation. At no point has the Company participated in, initiated, or sanctioned any rumor, communication, or activity regarding an acquisition by Gilead, or any other party. Pheton has had no contact

---

[13] Carmen Reinicke, *Chinese Stock Loses 90% in Minutes After Pump-and-Dump Warning*, BLOOMBERG (July 29, 2025), https://www.bloomberg.com/news/articles/2025-07-29/chinese-stock-loses-90-in-minutes-after-pump-and-dump-warning.

with Gilead, and any statements or reports suggesting otherwise were and are entirely false and fabricated.

Additionally, Pheton plans to engage with its market makers, Nasdaq, and relevant regulatory bodies for the purpose of holding responsible parties to the scheme accountable.

D.     **Regulators Take Aim at Companies Similar to PTHL**

63.     In the months following the PTHL market manipulation scheme, regulators began aligning and doubling their efforts to curtail such manipulation on U.S. stock exchanges.

64.     On September 3, 2025, the NASDAQ issued a press release entitled "NASDAQ PROPOSED CHANGES TO ITS LISTING STANDARDS[,]" in which NASDAQ announced proposals aimed at regulating micro-cap, low public float companies, like PTHL, that had increasingly become vehicles of fraud. The press release stated the following in pertinent part:

> Today, Nasdaq proposed a new set of enhancements to its initial and continued listing standards, reinforcing its long-standing commitment to capital formation while ensuring investor protection and upholding market integrity. These proposed updates introduce enhanced requirements for minimum company public float and capital raised during initial public offerings, alongside stricter suspension and delisting procedures for companies failing to meet Nasdaq's continued listings standards.
>
> The revised standards include:
>
> • A $15 million minimum market value of public float, applicable to new listings on Nasdaq under the net income standard.
> • An accelerated process for suspending and delisting companies with a listings deficiency that also have a Market Value of Listed Securities below $5 million.
> • A $25 million minimum public offering proceeds requirement for new listings of companies principally operating in China.
>
> "*Investor protection and market integrity are central to Nasdaq's mission*," said John Zecca, Executive Vice President and Global Chief Legal, Risk & Regulatory Officer. "These enhancements reflect our ongoing commitment to evolve our standards in step with

32

market realities and to lead by example in promoting fair and orderly markets. By increasing our standards for the minimum public float and the public offering raise in certain new listings, it provides a healthier liquidity profile for public investors, while still making emerging companies available to investors through our exchange. These new listing standards represent one step in a necessary, industry-wide effort—alongside regulators, U.S. exchanges, and market participants—to closely examine trading behaviors in small company securities, with the goal of safeguarding market integrity and enhancing protections for investors."

***The actions announced today follow Nasdaq's proactive review of trading activity, particularly emerging patterns associated with potential pump-and-dump schemes in U.S. cross-market trading environments.*** The proposed updates are also reflective of how market dynamics and company valuations have evolved over time, prompting the need to recalibrate Nasdaq's minimum liquidity standards to suit today's environment. These enhancements ensure that the thresholds for public listings remain relevant and effective as markets evolve.

As part of these changes, Nasdaq is reintroducing a minimum public offering proceeds requirement specifically for companies principally operating in China, building on previous standards set for "restrictive markets," in which the Public Company Accounting Oversight Board (PCAOB) could not inspect auditors. By applying this threshold, Nasdaq strengthens investor protections and enhances the liquidity profile of companies to reflect today's market environment.

In addition to the enhanced listing standards, ***Nasdaq will continue to actively refer cases to the Securities and Exchange Commission (SEC) and the Financial Industry Regulatory Authority (FINRA) on potentially manipulative trading activities, while strengthening our cooperation with both domestic and international regulators to reinforce effective oversight and maintain high standards across U.S. markets.***

(emphasis added.)

65.    Accordingly, NASDAQ was seeking to implement more rigid standards on companies with the profile of PTHL and cooperating with both the SEC and FINRA to identify manipulative trading activities.

66.     On September 5, 2025, the SEC issued a press release announcing "the formation of a task force that will strengthen and enhance the Division of Enforcement's efforts to identify and combat cross-border fraud harming U.S. investors." In the release, the SEC explained, in pertinent part, that "[t]he Cross-Border Task Force will focus initially on investigating potential U.S. federal securities laws violations related to foreign-based companies, including potential market manipulation, such as 'pump-and-dump' and 'ramp-and-dump' schemes."

67.     On September 12, 2025, the U.S. Department of Justice ("DOJ") issued a press release entitled "Co-CEO of Chinese Publicly Traded Technology Company and Financial Advisor Indicted for Over $100M Securities Fraud Scheme," which stated the following, in pertinent part:

> According to the indictment, Lai Kui Sen is the co-CEO of OST, and Yan Zhao, who goes by the aliases Hank Shi and Hank Shu, among others, is a financial advisor. ***OST is a Cayman Islands company with its principal operations in China***, that claimed to be a manufacturer of display modules used in consumer electronics, commercial LCD displays, and automotive displays. OST is publicly traded on NASDAQ and operated, at one point, with a variable interest entity (VIE) investment structure, which is often used by Chinese companies.
>
> According to the indictment, Sen, Zhao, and others allegedly engaged in a ***complex scheme to first provide a group of fifteen co-conspirators with tens of millions of OST shares through two non-bona fide securities transactions.*** In one of these transactions, these co-conspirators paid nothing to OST for more than 70 million OST shares.
>
> The indictment alleges that, ***on April 15, 2025, the same day that the select investors received their first tranche of heavily discounted OST shares, a fraudulent campaign began to artificially inflate the price and trading volume of the OST stock. This included promoting the stock by impersonating real investment advisors, among others, promoting the stock on social media, and creating a false impression of market-wide buying momentum.*** To capitalize on OST's artificial price inflation and to harm the victim investors, Zhao and Sen facilitated the opening of

34

brokerage accounts for certain select investors and orchestrated the selling of the shares that they had received either heavily discounted or for no remuneration. ***These sales generated substantial profits of approximately more than $110 million. Ultimately, according to the indictment, unwitting investors suffered significant losses when, on June 26, 2025, OST lost over $950 million in market capitalization, representing over 94% of its value.***

(emphasis added.)

68.    On September 17, 2025, the SEC filed its Verified Opposition to Petitioner's Motion to Quash Subpoena under the Right to Financial Privacy Act of 1978 in the matter of *Peiyong v. U.S. Securities and Exchange Commission*, Case No. 1:25-mc-00350 (ECF No. 7).[14] Therein, the SEC stated the following, in pertinent part:

> SEC Staff is investigating whether ***dozens of IPOs registered with the SEC and trading on U.S. exchanges between 2020 and 2025 (the "Relevant Offerings") were used as vehicles in a suspected IPO manipulation scheme ("Suspected IPO Manipulation Scheme") orchestrated by the persons and entities with ties to Hong Kong and China (the "Syndicate").*** In the days, weeks, and/or months following its IPO, each issuer's securities ***experienced unusual, extreme, and unexplained price movements, generally consisting of a large upward price spike followed by a drop to a price far below the high and often below the offering price.*** Today, these issuers' securities typically trade at a fraction of the offering price.
>
> SEC Staff's investigation indicates that ***the unusual price movements following the Relevant Offerings may have resulted from illegal market manipulation that the Syndicate orchestrated.*** Specifically, SEC Staff has information that tends to show that:

---

[14] On January 13, 2023, the SEC issued a Formal Order Directing Private Investigation and Designating Officers to Take Testimony in *In the Matter of Market Manipulation in Certain IPOs* (HO-14588) (the "Formal Order"). The Formal Order states that the SEC has information that tends to show that "U.S. Broker Dealers[,]" "Issuers[,]" "Hong Kong Broker-Dealers[,]" and "other persons and entities" may have been or may be engaging in violations of the federal securities laws including Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

- individuals and entities affiliated with the Syndicate acquired most of the issuers' public float by purchasing shares in many Relevant Offerings;

- shortly after the Relevant Offerings, anonymous third parties on the Internet convinced investors to purchase the issuers' securities at prices substantially higher than they were offered; and

- the accounts under the Syndicate's control that participated in the Relevant Offerings sold the issuers' shares at a significant profit into the bubble the solicitations created.

(emphasis added.)

69.    Later, on October 7, 2025, United States District Court Judge Dale E. Ho denied the Motion to Quash and granted enforcement of the subpoena. In his Memorandum Order, the Honorable Judge Ho explained that the SEC clearly linked the petitioner to its investigations, noting that the petitioner "appears to have also received significant proceeds from the Suspected IPO Manipulation scheme from other suspected [scheme] members," including "an entity in which [he] purchased a 40% ownership interest," and that one alleged entity connected with the scheme "disbursed a significant portion of . . . funds to other accounts related to Petitioner," including "one of [his] personal bank accounts."[15]

70.    Accordingly, regulators had identified companies with a similar profile to PTHL— recently IPOed, micro-cap companies with ties to China and miniscule public floats—as, at minimum, problematic for investors, and even worse, vehicles specifically designed to deceive investors, commit securities fraud, and market manipulation. Further, the SEC and DOJ were

---

[15] At this time, Plaintiffs lack sufficient information linking Han Peiyong or his affiliates directly to PTHL and accordingly, cannot name Mr. Peiyong in connection with this Complaint. However, discovery could yield more information regarding Mr. Peiyong's (or others') involvement in the alleged violations of law specific to PTHL and in turn, Mr. Peiyong and/or his affiliates (or other similar persons and affiliates) could be named as a Defendant or Defendants in an amended pleading.

actively investigating and pursuing enforcement proceedings against potential co-conspirators and perpetrators of securities fraud via an IPO stock manipulation scheme similar to that alleged herein.

## V.   **AUDITOR DEFENDANT ALLEGATIONS**

71.   The Auditor Defendant certified in the Prospectus and as part of the Registration Statement that "[i]n our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2022 and 2023, and the results of its operations and its cash flows for each of the years in the two-year period ended December 31, 2023, in conformity with accounting principles generally accepted in the United States of America."

72.   Additionally, the Auditor Defendant stated the following:

> Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

73.   In issuing its audit opinions on the Company's financial statements, the Auditor Defendant failed to comply with U.S. Generally Accepted Accounting Principles ("GAAP") and the standards of the Public Company Accounting Oversight Board ("PCAOB"). Those standards required the Auditor Defendant to exercise due professional care in the performance of the audit, to obtain competent and sufficient evidentiary matter to form a basis for its opinion, and to obtain reasonable assurances that the financial statements were free from material misstatement, whether caused by error or fraud.

74.   In conducting its audits, the Auditor Defendant had access to the files and key employees of the Company at all relevant times. The Auditor Defendant had continuous access to

and knowledge of the Company's confidential internal, corporate, financial, operating and business information, and had the opportunity to observe and review PTHL's business and accounting practices, and to test the Company's internal accounting information and publicly reported financial statements. Accordingly, the Auditor Defendant was aware of the significant deficiencies at the Company. Thus, if the Auditor Defendant had complied with PCAOB standards, it would have determined that there was no reasonable basis for its audit report because, among other things, the Auditor Defendant was aware of undisclosed facts tending to seriously undermine the accuracy of its audit report and conformity with GAAP and the Company's reported financial metrics.

75.     The Auditor Defendant's representations were material to investors because PTHL was a newly public, foreign issuer with no meaningful public operating history in the United States. Without the Auditor Defendant's clean audit opinion and consent to the inclusion of its audit report in the Registration Statement and Prospectus, PTHL could not have completed the IPO in the form presented to investors.

76.     The Auditor Defendant's audit failures were not isolated and have continued since PTHL's IPO in September 2024. Marcum Asia served as auditor for multiple foreign issuers that shared PTHL's profile and later experienced extreme price volatility, trading halts, and severe investor losses, including JYD, Ruanyun Edai Technology Inc. (NASDAQ: RYET), and POMDOCTOR Ltd (NASDAQ: POM). As outlined above, FINRA issued three separate public warnings outlining "red flags" related to small-cap IPOs of foreign issuers with primary operations in China. The Auditor Defendant was obligated to heed these warnings as part of its risk assessment and fraud-detection obligations under PCAOB Auditing Standards.   Instead, the

38

Auditor Defendant issued a clean audit opinion that helped create the appearance of legitimacy necessary for the IPO and subsequent market manipulation scheme.

## VI.    CLASS ACTION ALLEGATIONS

77.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired PTHL securities between September 5, 2024, and July 29, 2025, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

78.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, PTHL's shares actively traded on the NASDAQ. While the exact number of Class Members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of PTHL shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by PTHL or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

79.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

80.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

39

81.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of PTHL; and

c.    to what extent the members of the Class have sustained damages and the proper measure of damages.

82.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VII.    UNDISCLOSED ADVERSE FACTS

83.    The market for PTHL securities was open, well-developed, and efficient at all relevant times. As a result of these materially false and misleading statements and/or failures to disclose, PTHL securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired PTHL securities relying upon the integrity of the market price of the Company's securities and market information relating to PTHL and have been damaged thereby.

84.    Throughout the Class Period, Defendants materially misled the investing public thereby inflating the price of PTHL securities, by publicly issuing false and/or misleading

statements and/or omitting to disclose the material facts necessary to make Defendants' statements, as set forth herein, not false or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about PTHL's business, operations and prospects as alleged herein.

85.    At all relevant times, the material misrepresentations and omissions particularized in the Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about PTHL's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company, its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements and omissions during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## VIII.   <u>LOSS CAUSATION</u>

86.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

87.    During the Class Period, Plaintiffs and the Class purchased PTHL's securities at artificially inflated prices and were damaged thereby. The price of PTHL's securities significantly declined when the misrepresentations made to the market, and/or the information alleged to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## IX.    SCIENTER ALLEGATIONS

88.    As alleged herein, Defendants acted with scienter because Defendants: (1) knew that the public documents and statements issued or disseminated in the name of PTHL were materially false and/or misleading; (2) knew that such statements or documents would be issued or disseminated to the investing public; and (3) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding PTHL, their control over, and/or receipt and/or modification of PTHL's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

## X.    APPLICABILITY OF PRESUMPTION OF RELIANCE
(FRAUD-ON-THE-MARKET DOCTRINE)

89.    The market for PTHL's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, PTHL's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of PTHL's securities and market information relating to the Company, and have been damaged thereby.

90.    During the Class Period, the artificial inflation of PTHL's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about PTHL's business, prospects, and operations. These material misstatements and/or

42

omissions created an unrealistically positive assessment of PTHL and its business, operations, and prospects, thus causing the price of PTHL's securities to be artificially inflated at all relevant times, and, when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements and/or omissions during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, and each of them has been damaged as a result.

91.    At all relevant times, the market for PTHL securities was an efficient market for the following reasons, among others:

      a.    PTHL shares met the requirements for listing and were listed and actively traded on NASDAQ, a highly efficient and automated market; and/or

      b.    PTHL communicated with public investors through established market communication mechanisms, including through dissemination of press releases on national circuits of major newswire services and through other public disclosures.

92.    As a result of the foregoing, the market for PTHL securities promptly digested current information regarding PTHL from all publicly available sources and reflected such information in PTHL's share price. Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of PTHL's securities at artificially inflated prices and a presumption of reliance applies.

93.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse

43

information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.    NO SAFE HARBOR

94.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in purportedly forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of PTHL who knew that the statement was false when made.

## FIRST CLAIM

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5(b)**
**Against PTHL, the Individual Defendants, the Auditor Defendant,**
**and the Underwriter Defendants**

95.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

44

96.    During the Class Period, Defendants PTHL, the Individual Defendants, the Auditor Defendant, and the Underwriter Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase PTHL securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants and each defendant took the actions set forth herein.

97.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for PTHL securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

98.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about PTHL's financial well-being and prospects, as specified herein.

99.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of PTHL's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to

45

make the statements made about the Company and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

100.   Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company or their business relationship in connection with the Company and its IPO, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections, internal controls and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data information about the Company's finances, operations, and sales at all relevant times, and/or were required to perform reasonable due diligence in connection with the IPO; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

101.   Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing PTHL's true financial well-being and prospects from the

46

investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements and/or omissions regarding the Company's business, operations, financial well-being and prospects, and exposure to material, realized risks throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

102.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, set forth above, the market price of PTHL securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and other members of the Class acquired PTHL securities during the Class Period at artificially inflated prices and were damaged thereby.

103.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that PTHL was experiencing, which was not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their PTHL securities, or, if they had acquired such securities during the Class Period, they would not have done so at artificially inflated prices.

104. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

105. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

**Violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) & (c)
for Fraud in Connection with the Sale or Purchase of a Security
Against PTHL, the Individual Defendants, the Auditor Defendant,
and the Underwriter Defendants**

106. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

107. During the Class Period, Defendants PTHL, the Individual Defendants, the Auditor Defendant, and the Underwriter Defendants directly or indirectly, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, intentionally, knowingly, or recklessly: (i) employed devices, schemes, or artifices to defraud; and (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

108. The Defendants identified in connection with this Claim employed devices, schemes and artifices to defraud and deceive Class Period purchasers of PTHL securities by: (i) initiating, endorsing, executing and/or completing the IPO on PTHL's behalf and permitting trading in PTHL securities on a national securities exchange while knowing or acting in reckless disregard to the fact that PTHL was not a legitimate business; (ii) initiating, endorsing, executing and/or completing the IPO on PTHL's behalf and permitting trading in PTHL securities on a

national securities exchange while knowing or acting in reckless disregard to the fact that PTHL was the target of a market manipulation and promotional scheme; and/or (iii) attempting to manufacture artificial inflation by triggering volatility trading via false and misleading statements.

109.    At the time, Plaintiffs and other members of the Class were ignorant of the identified Defendants' deceptions. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the deceptive acts and schemes, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their PTHL securities, or, if they had acquired such securities during the Class Period, they would not have done so at artificially inflated prices.

110.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rules 10b-5(a) & (c) promulgated thereunder.

111.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### THIRD CLAIM

**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

112.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

113.    The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the operations and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the identified Defendants had the power to influence and

49

control and did influence and control, directly or indirectly, the decision-making of the entities that they control, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

114. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercise the same.

115. As set forth above, PTHL violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**FOURTH CLAIM**

**Violation of Section 11 of the Securities Act**
**Against PTHL, the Individual Defendants,**
**the Auditor Defendant, and the Underwriter Defendants**

116. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein, only to the extent, however, that the allegation does not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or the other members of the Class.

117. This Claim is brought pursuant to Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, on behalf of the Class, against PTHL, the Individual Defendants, the Auditor

Defendant, and the Underwriter Defendants. This Claim does not sound in fraud. Plaintiffs do not allege that Defendants had scienter or fraudulent intent, which are not elements of a Section 11 claim.

118. The Registration Statement contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein non-misleading, and omitted to state material facts required to be stated therein.

119. As an issuer of securities to the public, PTHL is strictly liable to Plaintiffs and the Class for the misstatements and omissions.

120. Each of the Individual Defendants signed the Registration Statement. Each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. By virtue of their failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts and omissions of material fact necessary to make the statements made therein not misleading. As such, the Individual Defendants are strictly liable to Plaintiffs and the Class.

121. The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Registration Statement for the IPO was prepared properly and accurately. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein. As such, the Underwriter Defendants are strictly liable to Plaintiffs and the Class.

122. The Auditor Defendant failed to perform an adequate audit in connection with its role as auditor and was negligent in issuing an unqualified opinion on financial statements that were materially misstated. The Auditor Defendant's failure to conduct an adequate audit in

51

accordance with PCAOB standards was a substantial factor leading to the harm complained of herein. As such, the Auditor Defendant is strictly liable to Plaintiffs and the Class.

123.    Defendants were responsible for the contents and dissemination of the Registration Statement. None of the Defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the Registration Statement were complete, accurate, or non-misleading. By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

124.    Plaintiffs and the other members of the Class purchased PTHL securities pursuant or traceable to the Registration Statement for the IPO and have sustained damages as a result. The price of PTHL securities has declined substantially subsequent to and due to Defendants' violations.

125.    Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiffs commenced this action. Less than three years elapsed between the time the securities upon which this Claim is brought were offered to the public and the time Plaintiffs commenced this action.

## FIFTH CLAIM

### Violation of Section 12(a)(2) of the Securities Act
### Against PTHL and the Underwriter Defendants

126.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein, only to the extent, however, that the allegation does not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or the other members of the Class.

127.    This Claim is brought pursuant to Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2), on behalf of the Class, against PTHL and the Underwriter Defendants. This

Claim does not sound in fraud. Plaintiffs do not allege that Defendants had scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

128.    PTHL and the Underwriter Defendants were sellers and offerors and/or solicitors of purchasers of the PTHL securities offered pursuant to the Prospectus and issued in connection with the IPO. Plaintiffs and other members of the Class purchased or otherwise acquired PTHL securities pursuant to the IPO. The Prospectus contained defective and inaccurate statements that Defendants used to induce Plaintiffs and the other members of the Class to purchase PTHL securities registered in the IPO.

129.    The Underwriter Defendants participated in the preparation and dissemination of the defective and inaccurate Prospectus for their own financial benefit. But for their participation in the IPO, including its solicitation, the IPO could not, and would not, have been accomplished.

130.    The Prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. PTHL and the Underwriter Defendants owed Plaintiffs and the other members of the Class who purchased the PTHL securities pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.

131.    Plaintiffs did not know, nor in the exercise of reasonable diligence could Plaintiffs have known, of the untruths and omissions contained in the Prospectus at the time Plaintiffs acquired PTHL securities.

132.    By reason of the conduct alleged herein, PTHL and the Underwriter Defendants violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations,

Plaintiffs and the other members of the Class who purchased the PTHL securities pursuant to the Prospectus sustained substantial damages in connection with their purchases of the securities. Accordingly, Plaintiffs and the other members of the Class who hold the securities issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their securities and hereby tender their securities to the Defendants sued herein. Class members who have sold their securities seek damages to the extent permitted by law.

133.    Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiffs commenced this action. Less than three years elapsed between the time the securities upon which this Claim is brought were offered to the public and the time Plaintiffs commenced this action.

## SIXTH CLAIM

### Violation of Section 15 of the Securities Act
### Against the Individual Defendants

134.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein, only to the extent, however, that the allegation does not allege fraud, scienter, or the intent of the Defendants to defraud Plaintiffs or the other members of the Class.

135.    This Claim is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class, against the Individual Defendants. This Claim does not sound in fraud. Plaintiffs do not allege that Defendants had scienter or fraudulent intent, which are not elements of a Section 15 claim.

136.    The Individual Defendants each were control persons of PTHL by virtue of their positions as directors and/or senior officers of PTHL. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of PTHL.

54

137. The Individual Defendants each were culpable participants in the primary violations of Sections 11 and 12(a)(2) of the Securities Act alleged herein, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

138. Less than one year elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiffs commenced this action. Less than three years elapsed between the time the securities upon which this Claim is brought were offered to the public and the time Plaintiffs commenced this action.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

a.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

b.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.    Such other and further relief as the Court may deem just and proper.

### <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury.

Dated: July 29, 2026

<div style="margin-left:50%">

**MORRIS KANDINOV LLP**

*/s/ Andrew W. Robertson*
Aaron T. Morris
Andrew W. Robertson
305 Broadway, 7th Floor
New York, New York 10007
Tel: (212) 431-7473
aaron@moka.law
andrew@moka.law

**MORRIS KANDINOV LLP**
Leonid Kandinov
550 West B Street, 4th Floor
San Diego, CA 92101
Tel. (619) 780-3993
leo@moka.law

*Attorneys for Plaintiffs*

</div>

56